IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

UNITED STATES OF AMERICA :

    v.                :   Criminal No. 1:22-CR-00114

RASHAWN PERKINS        :

    Defendant          :

## MEMORANDUM IN SUPPORT OF DEFENSE MOTION TO SUPRESS UNLAWFUL SEARCHES

Rashawn Perkins, through counsel, hereby provides this memorandum of facts and authorities in support of his motion to suppress the unlawful searches conducted in this case.  Your defendant moves this Court for entry of an Order suppressing the unlawful searches conducted pursuant to invalid search warrants and any and all resulting evidence that was gathered from that use, either directly or indirectly.  An evidentiary hearing, pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978), and *United States v. Lull*, 824 F.3d 109 (4th Cir. 2016), is requested, to determine the scope of the violations and so that illegally obtained evidence and the fruits thereof can be suppressed.

This memo, supporting documentation, and a *Franks* hearing will show, by a preponderance of the evidence, (1) that the law enforcement affiant made a false statement or omitted essential information either intentionally or with a reckless disregard for the truth in the affidavits in support of a search warrant

for the warrants in question, and (2) that the false statement or omitted information was material, in that it was necessary to the judge's determination of probable cause. *See Lull*, 824 F.3d at 114-1.

Upon this showing, the Court will be asked to enter an order suppressing the illegal searches, the evidence from those searches, and the fruits of those searches.  If a *Franks* hearing is appropriate and an affiant's material perjury or recklessness is established by a preponderance of the evidence, the warrant "must be voided" and evidence or testimony gathered pursuant to it must be excluded. *Franks*, 438 U.S. at 156, 98 S. Ct. at 2676. A warrant that violates Franks is not subject to the good-faith exception to the exclusionary rule announced in *United States v. Leon*, 468 U.S. 897, 923, 104 S. Ct. 3405, 3420, 82 L. Ed. 2d 677 (1984). *See United States v. Colkley*, 899 F.2d 297, 300 (4th Cir. 1990).

## BACKGROUND

The search warrants at question in this case, executed on Facebook for account Rashawn.Perkins.52 (hereinafter Facebook) and at 7971 Audubon Avenue, Alexandria, Virginia (hereinafter Audubon) were issued by state authorities in Fairfax County, Virginia, by request of the Fairfax County Police Department.  The affidavits in support of those warrants contained material falsehoods and omissions which, if known, would have resulted in the warrants not issuing; therefore, their issuance violates the Fourth and Fourteenth

Amendment rights of your Defendant.   Specifically, information from a Confidential Informant (CI) was used to support the issuance of both of the search warrants in question.   The affiant recklessly or intentionally omitted critical information regarding the CI's truthfulness, and misrepresented to the Court that the CI was reliable.   Additionally, the CI was represented to have provided information to law enforcement that was verified through independent investigation.   The information provided by the CI was false.   The affiant either must have known this and made a misrepresentation to the Court, or recklessly misrepresented to the Court that the information had been verified when it had, in fact, not been.   Had this been known to the issuing Court, there would not have been judicial approval for the search warrants.

The Facebook search warrant and supporting affidavit are attached hereto as **Exhibit 1**; the Audubon search warrant and supporting affidavit are attached hereto as **Exhibit 2**.   The second Audubon search (Audubon 2) is attached hereto as **Exhibit 3**.   A government disclosure letter dated July 25, 2022 is **Exhibit 4**.

**THE FACEBOOK SEARCH WARRANT**

### A. Facts regarding the Confidential Informant

On February 14, 2022, Detective J. Andrea of the Fairfax County Major Crimes Unit prepared an affidavit in support of a search warrant directed to

Facebook, a company in Menlo Park, California, that provides Social Media and electronic communication services.   The specific profile sought was Rashawn.Perkins.52.   The probable cause alleged in the affidavit for the Facebook warrant was the following:

Your affiant submits the following facts as probable cause for the issuance of this search warrant.

On 02/05/2022 at approximately 1718 hours, two offenders entered the 7-11 on Parcher Ave, Herndon VA on foot. Both offenders will be referred to as O1 and O2 hereinafter. O1 produced a handgun that looked to be a 1911 style firearm based upon surveillance footage. When O1 produced the firearm, O2 went around the counter and took cash from register 1. O2 then went around the counter and took cash from register 2. Both offenders then exited the store and ran away on foot.

O1 was as a B/M in his 20s; medium size; medium build; wearing distinctive red, black and white "AIR" sneakers; dark pants; dark "Adidas" hooded sweatshirt; a black ski mask; and a red knit hat.

O2 was a B/M in his 20s; tall; thin build; wearing dark sneakers with white soles and white on the sides and tongue; gray and black pants; a dark hooded sweatshirt with a white Play Station logo on the front, white writing on the sleeves, and a white Play Station logo on the back; and a black ski mask.

On 02/05/2022 at approximately 1728 hours, the same offenders, O1 and O2, entered the Sunoco gas station on 13470 Coppermine Rd, Reston VA and robbed the clerk at gunpoint for US currency. Both offenders fled the store on foot.

On or about 02/07/2022, a confidential informant, who will be referred to as CI hereinafter, relayed to law enforcement that they knew O1 and O2 and that they (O1 and O2) robbed the 7-11 and Sunoco on 02/05/2022. The CI has provided information in the past that was proven to be credible and reliable. The CI provided information on the offender's social media profiles. The CI stated on the day of the robbery, O1

showed her / him a handgun and told her / him that they (O1 and O2) were going to do a robbery. The CI stated O1 was wearing a black sweatshirt, something red on his head and red and black shoes which is what O1 wore

2

Ex. 1 at *10.   The affidavit continued:

during the robberies. The CI stated O1 always has a red hat or something red. The CI also stated O1 and O2 went to the McDonalds located at 1071 Elden St, Herndon VA after the robberies and counted the money they stole during the robberies. The CI also stated O1 and O2 drive an older model white Toyota. Law Enforcement database revealed that O2 is associated with a white 2005 Toyota bearing VA tag UEH2887. The vehicle is registered to Isha Bangura of 20509 Reserve Falls Terrace #402, Sterling VA.

O1 was identified as Rashawn Tariq Perkins with a DOB of 10/22/1993. Perkins has a picture of himself on Facebook wearing the same distinctive red, black and white "AIR" sneakers as the ones worn by O1 during both robberies on 02/05/2022. Additionally, Perkins physical description matches the description of O1. A criminal history check of O1 revealed that he is a (4X) Convicted Felon with multiple arrests to include; Possession of a Firearm by a Convicted Felon; Credit Card Theft; Felony Receiving Stolen Property; Credit Card Fraud; Credit Card Forgery; Grand Larceny; Possession of Narcotics; Probation Violation; Destruction of Property; Contempt of Court; Assault; Petit Larceny. Perkins face book handle is "Dizzy Shawn" Facebook account - **HTTPS://WWW.FACEBOOK.COM/RASHAWN.PERKINS.52.**

Ex. 1 at *11. The "distinctive" shoes in question from a photo on the Facebook page and observed at the robbery were mass-market Nike Air Uptempo shoes, which have been rereleased since 2017, most recently on April 16, 2021.[1] They retail for around $160 at Nike stores (which number more than 1,000 worldwide)[2] and other footwear dealers, such as Foot Locker and Champs, throughout the country and worldwide. Nike sold over 17 billion dollars of products in North America alone in 2021, the latest re-release date of these shoes.[3] While exact productions numbers are not available publicly, currently there are thousands of listings for these shoes available on the internet from shoe stores, sports apparel, and internet resellers, in addition to

---

[1] https://www.kicksonfire.com/app/nike-air-more-uptempo-bulls/
[2] https://www.statista.com/statistics/241692/nikes-sales-by-region-since-2007/
[3] Id.

stock available in physical stores.   The affiant's conclusion that the shoes were the "same" was without basis.

The physical description of the perpetrator of the robberies was even more general than the shoes:

> O1 was as a B/M in his 20s; medium size; medium build; wearing distinctive red, black and white "AIR" sneakers; dark pants; dark "Adidas" hooded sweatshirt; a black ski mask; and a red knit hat.

There is only a general description of a black person with a medium size and build, wearing mass market clothing.

With nothing more than a general description and some widely available clothing to go on, law enforcement sought to have a CI give them a lead. However, the affiant did not disclose several critical facts bearing on the reliability of the CI or of the investigation that followed.   First, the CI had been known to have lied on a government form, denying gang affiliation when he was in fact part of a gang, MS-13, according to Detective McManus of the Town of Herndon Police.   In a disclosure letter dated July 25, 2022, (Exhibit 4) the United States made the following disclosure:

Pursuant to the United States' continuing discovery obligations, the government discloses the following information:

Confidential Source

On February 7, 2022, Det. Calo of the Herndon Police Department received information from J.G.A.V., a/k/a "Blackie," concerning the February 5, 2022 robberies indicted in this case. Det. Calo shared that information with the Fairfax County Police Department ("FCPD") and the FBI.  On February 10, 2022, Det. Calo and Special Agent Shively interviewed J.G.A.V. at the Town of Herndon Police Station, and he provided them with further information.[1]  J.G.A.V. was found murdered the following evening.  J.G.A.V. is the confidential source referenced in the Fairfax County police reports pertaining to the February 5, 2022 robberies and the various affidavits in support of search warrants pertaining to those robberies.

After Mr. Perkins and Mr. Bangura were arrested and their residences were searched, the FCPD detectives investigating Mr. Perkins and Special Agent Shively learned that a different Herndon detective (Det. McManus) did not believe J.G.A.V. to have been a reliable source because J.G.A.V. had previously denied gang membership/association when completing sworn immigration paperwork and Det. McManus knew J.G.A.V. to be an MS-13 member/associate. Neither the FCPD detectives nor Special Agent Shively were aware of this information prior to Mr. Perkins and Mr. Bangura being arrested.  The FCPD detectives had corroborated the information provided by J.G.A.V. prior to obtaining search warrants based on that information.

The Government has made representations regarding Agent Shively and Detective Calo, but has not made any representations regarding what the affiant, Detective Andrea of Major Crimes, knew, or the basis for his knowledge.  It is clear from this disclosure that detectives in the town of Herndon knew that the CI was not a reliable source, and had lied to the government.  The affiant, who does not claim to have worked with the CI in the past, gave only the following recitation of the CI's background and reliability:

On or about 02/07/2022, a confidential informant, who will be referred to as CI hereinafter, relayed to law enforcement that they knew O1 and O2 and that they (O1 and O2) robbed the 7-11 and Sunoco on 02/05/2022. The CI has provided information in the past that was proven to be credible and reliable. The CI

In assessing the reliability of the CI, the issuing judge is not given anything except a boilerplate recitation that the CI provided information in the past that was proven to be credible or reliable. There is not a statement about how many cases, arrests, or verified disclosures had been made by the CI. There is no support to say how or why the CI is reliable and how that is known to the affiant. Additionally, at least one detective, Detective McManus, knew that the CI was *not reliable*, and had lied to the government. The affiant failed to report the unreliable nature of the CI to the issuing judge. That knowledge was known to law enforcement, meaning that either the truthfulness of the CI had not been investigated by the affiant, or that the affiant acted with reckless disregard for the truth.

Additionally, the government provided the following in its letter of July 25, 2022: "the FCPD detectives had corroborated the information J.G.A.V. prior to obtaining the search warrants based on that information." Ex. 4 at *1. to the extent that corroboration of the CI was only checking social media accounts to see some similar clothing as in videos, mass market clothing is insufficient to verify the CI's reliability. If the extent to which the CI was verified was to say that a sneaker brand with tens of thousands if not hundreds of thousands of pairs of shoes are in circulation means he was accurate, that is not a basis for probable cause.

In the affidavit, the affiant lists the following information provided by the CI:

> On or about 02/07/2022, a confidential informant, who will be referred to as CI hereinafter, relayed to law enforcement that they knew O1 and O2 and that they (O1 and O2) robbed the 7-11 and Sunoco on 02/05/2022. The CI has provided information in the past that was proven to be credible and reliable. The CI provided information on the offender's social media profiles. The CI stated on the day of the robbery, O1 showed her / him a handgun and told her / him that they (O1 and O2) were going to do a robbery. The CI stated O1 was wearing a black sweatshirt, something red on his head and red and black shoes which is what O1 wore

> during the robberies. The CI stated O1 always has a red hat or something red. The CI also stated O1 and O2 went to the McDonalds located at 1071 Elden St, Herndon VA after the robberies and counted the money they stole during the robberies. The CI also stated O1 and O2 drive an older model white Toyota. Law Enforcement database revealed that O2 is associated with a white 2005 Toyota bearing VA tag UEH2887. The vehicle is registered to Isha Bangura of 20509 Reserve Falls Terrace #402, Sterling VA.

Ex. 1 at *10-11.  There are only two incriminating pieces of information provided by the CI, and only one that is potentially verifiable.  The incriminating information that cannot be verified is the purported statement of O1 to the CI.  There is no suggestion that it was recorded, or that the statement was made around other witnesses.  Therefore, it is not verifiable before the issuance of a warrant.  The only incriminating information that might be verifiable is the claim that O1 and O2 were counting money at the McDonalds on 1071 Elden St. in Herndon after the robbery.

Video from inside and outside the McDonalds on February 5 was provided in discovery.  The undersigned has reviewed the videos on the date in question.  No one in the restaurant is seen counting money other than small

change from purchase of a meal.  No one matching the descriptions and clothing of O1 and/or O2 are seen at the restraurant.[4]

The affiant signed and submitted the affidavit on February 14.  The CI provided this information on February 7.  The only information that was subject to verification, the video from McDonalds, does not support the CI's claims. Had the police investigated and watched the videos, they would have seen the CI was, yet again, misleading them.  This material misrepresentation, which was either made intentionally or with reckless disregard for the truth, further supports invalidating the search warrant.

When the search warrant for Facebook has the CI's unreliability included, and confirmation that the only potentially verifiable information provided was not shown on surveillance video, the issuing judge would not have found probable cause for the issuance of the warrant.

**b. Applicable law regarding the Confidential Informant and *Franks* hearings.**

In *Franks v. Delaware*, 438 U.S. 154, 98 S. Ct. 2674, 57 L. Ed. 2d 667 (1978), the Supreme Court held a defendant can attack a facially sufficient

---

[4] In a discussion with counsel for the United States on August 8, 2022, it was disclosed that there is a video that potentially shows a person who could be the defendant at the McDonalds, wearing different clothing than what was identified as being worn by O1, on the evening of February 5, 2022, but that does not show him counting money.  The Government theory may be that the counting was not on camera.  In a follow up discussion, Detective Andrea represented to the Government that before seeking warrants, he watched a video at McDonalds from before the February 5th robbery, but did not watch any video from after the robbery, which is a material omission that would go towards a probable cause determination.

affidavit when a defendant makes a substantial preliminary showing that a false statement, made knowingly and intentionally or with reckless disregard for the truth, was included by the affiant in the warrant affidavit.  Id. at 155-56, 98 S. Ct. at 2676-77. This showing must be accompanied by an offer of proof. *Id.* at 171, 98 S. Ct. at 2684.  In addition, the false information must be essential to the probable cause determination: "if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required."  *Id.* at 171-72, 98 S. Ct. at 2684-85. The *Franks* test also applies when affiants omit material facts "with the intent to make, or in reckless disregard of whether they thereby made, the affidavit misleading." *United States v. Colkley*, 899 F.2d 297, 300 (4th Cir. 1990) (citing *United States v. Reivich*, 793 F.2d 957, 961 (8th Cir. 1986)).

It is established law that a warrant affidavit must set forth particular facts and circumstances underlying the existence of probable cause, so as to allow the magistrate to make an independent evaluation of the matter.  *United States v. Lull*, 824 F.3d 109, 116 (4th Cir. 2016) (internal citations omitted). Reckless disregard may be established by proffering evidence that a police officer failed to inform the judicial officer of facts they knew would negate probable cause.  *See Lull*, 824 F.3d at 117 (4th Cir. 2016).  Where an informant is used, the trustworthiness of the confidential informant lies at the heart of

the reliability determination. *Id.* When the information forming the basis for probable cause comes from an informant, the informant's "veracity" and "reliability" are critical to the totality of the circumstances test. *Id.* at 118. The Fourth Circuit, in *Lull*, held that "a judicial officer's assessment of probable cause . . . must include a review of the 'veracity' and 'basis of knowledge' of persons supplying hearsay information." *Id.; see also United States v. Perez*, 393 F.3d 457, 461-62 (4th Cir. 2004). As recognized by the Fourth Circuit, reliability is "key" to a magistrate's probable cause analysis when the search warrant application contains information provided by an informant. *See United States v. Wilhelm*, 80 F.3d 116, 119 (4th Cir. 1996).

If a *Franks* hearing is appropriate and an affiant's material perjury or recklessness is established by a preponderance of the evidence, the warrant "must be voided" and evidence or testimony gathered pursuant to it must be excluded. *Franks* at 156, 98 S. Ct. at 2676. A warrant that violates Franks is not subject to the good-faith exception from *United States v. Leon*, 468 U.S. 897, 923, 104 S. Ct. 3405, 3420, 82 L. Ed. 2d 677 (1984). *Colkley*, 899 F.2d 297, 300 (4th Cir. 1990).

**The Overbreadth of the Facebook Warrant**

### a. Nature of the tracking

Assuming, *arguendo*, that the Facebook warrant is not invalid for lack of probable cause from the misleading information, the warrant was overly broad

for the probable cause established. The search in this case, from the Facebook warrant, called for thirty days of surreptitious, undisclosed, prospective tracking, so that the government would potentially know everywhere the account holder, alleged to be Mr. Perkins, went, and all communication through social media. This was a broad, indiscriminate search seeking to turn up evidence to be used for their criminal case. The agents were out to chart movements for a full month, for use in their criminal prosecution. This was overly broad compared to the probable cause, which did not establish a basis to search all movements for a month.

### a. Applicable law governing overbreadth of open ended electronic tracking

The Warrant Clause of the Fourth Amendment categorically prohibits the issuance of any warrant except one "particularly describing the place to be searched and the persons or things to be seized." U.S. Const. Amend. IV. The manifest purpose of this particularity requirement was to prevent general searches. *Maryland v. Garrison*, 480 U.S. 79, 84 (1987). By limiting the authorization to search to the specific areas and things for which there is probable cause to search, the requirement ensures that the search will be carefully tailored to its justifications, and will not take on the character of the wide-ranging exploratory searches the Framers intended to prohibit. *Id.*

Thus, the scope of a lawful search is "defined by the object of the search and the places in which there is probable cause to believe that it may be found. *Id.*

In *Katz v. United States*, 389 U.S. 347, 351 (1967), the Supreme Court recognized that "the Fourth Amendment protects people, not places," and that the Fourth Amendment protects those expectations of privacy society is prepared to recognize. Its origin traces back to the British use of writs of assistance whereby British officers could issue a writ with no oversite and go rummaging around in the private papers, effects and places of anyone they chose. *See accord, Leaders of a Beautiful Struggle v. Balt. Police Dep't*, 979 F.3d 219 (4th Cir. 2020) (noting that the Fourth Amendment inquiry is whether an individual reasonably expects that aspects of their private life will be protected from government intrusion and whether society is prepared to recognize that expectation as reasonable) (citing *Carpenter v. United States*, 585 U.S. ____, 16-402 (2018)).

Prior to the ubiquitous use of cell phones, agents could not rummage around in a person's life with the ease that cell phones provide today. As Chief Justice Roberts observed for the Court in *Riley v. California*, 573 U.S. 373 (2014), "… modern cell phones, … are now such a pervasive and insistent part of daily life that the proverbial visitor from Mars might conclude they were in important feature of human anatomy. A smart phone … was unheard of ten years ago…". *Id.* at 385. Because cell phones today have such an abundance of detailed

14

information, they contain more information about the individual than the individual may have in the entirety of their home.  They can have medical records, business records, family records, photographs, address books, and can reveal with whom an individual has contact, with what frequency, and whether or not they are engaged in telephone, text messages, or other like activities. They can contain the whole of a person's life, which is why the Supreme Court requires a search warrant issued by a judge based on probable cause in order to invade that privacy.  *Riley* held that people have a reasonable expectation of privacy in that information.

There are privacy interests that are not diminished or curtailed by the fact that a third party, such as a cell phone service provide, has access to extensive data about people which it gathers and retains in the course of providing modern cell phone services to its customers.  Modern cell phone service providers have changed the nature of the information and data they have about their customers and how that information or data may be accessed and retained.  New developments in science and technology, such as in this communications revolution, do not diminish Fourth Amendment protections. *See Kyllo v. United States*, 533 U.S. 27 (2001), which made it quite plain that the fact that new technology allows law enforcement greater access to information than existed before (such as in 1976 when Miller, supra, was

decided), does not mean that the new technology allows an end run around the Fourth Amendment.

The Supreme Court in *Carpenter v. United States*, 585 U.S. ___, 16-402 (2018), the recognized that with modern cell phones, the carriers who provide service amass a great deal of data and information for their own business purposes. The cell phone user has almost no control over their data collection. In that context, the Court recognized that when individuals seek to preserve something as private, and society is prepared to recognize their privacy interest, then official invasion of that interest requires a search warrant supported by probable cause. Modern cellphone service providers are not like the telephone companies of the past. Their computerized systems amass and retain all manner of information. The invasion of privacy they can provide to law enforcement is massive and, as held in *Carpenter, supra*, and also recognized in *Riley v. California, supra*, is entitled to Fourth Amendment protection. The Supreme Court did not allow the third-party doctrine in *United States v. Miller*, 425 U.S. 435 (1976) or *Smith v. Maryland*, 442 U.S. 735 (1979) to override the reasonable expectation of privacy protected by the Fourth Amendment, that people who use modern cell phones are entitled to expect.

That people who use modern cell phones and related technology do not, by that use, surrender to the government the privacy of their life, was presaged by Justice Sotomayor in her concurrence in *United States v. Jones*, 565 US 400

(2012). She recognized that people reasonable do not expect that their information would be recorded and aggregated in a manner that enables the government to ascertain, more or less at will, a vast array of personal affiliations and identifications. *Id.* at 416. She went on to observe the problems with the third party doctrine which, is "ill-suited to the digital age in which people reveal a great deal of information about themselves to third parties in the course of carrying out mundane tasks. People disclose the phone numbers that they dial or text to their cellular providers; the URLs that they visit and the email addresses with which they correspond to their … service providers; and the books, groceries, and medications they purchase …" *Id.* at 417. She recognized that people would not surrender unbridled invasions of their privacy to the government simply because an individual lives in this modern, technological age.

The search in this case, from the Facebook warrant, called for thirty days of anonymous, prospective tracking, so that the government would potentially know everywhere the account holder, alleged to be Mr. Perkins, went, and all communication through social media. This was a broad, indiscriminate search seeking to turn up evidence to be used for their criminal case. The agents were out to chart movements for a full month, for use in their criminal prosecution. This is much more extensive than merely the phone numbers he called, like a pen register. This is delving into the intimacies of his life. It was a search into

where and when he traveled, where he stayed, and what he did.  This is more detailed information that they could have accessed if they had a team of agents following him around 24 hours per day, seven days a week.  Upon suspicion of a crime, the agents sought to track your defendant for a month, intruding into the home, into private associations, such as church, a doctor's office, or intimate relations.  Mere suspicion of a crime does not allow the police to surreptitiously gather data on every social media interaction and the equivalent of full GPS tracking.  The showing made in the Facebook warrant called for a search that was overly broad and invaded spheres that the public recognizes as protected for any member of our modern society.  To the extent probable cause in the warrant was established, it did not justify an open ended, month long tracking of all movements of the account holder and an invasion into all private spheres of life over the course of a month

**The Audubon Searches**

**a. Factual background**

The search of Facebook and its return led to the application and issuance of a warrant to search the home at 7971 Audubon Avenue, #202, Alexandria, Virginia (Exhibit 2).  A second warrant followed (Exhibit 3) after an initial search under the first warrant.  In the affidavit, the affiant, Detective Andrea, explains how the use of the Facebook warrant led to the identification of Audubon Avenue:

18

An electronic device accessing O1's (Perkins) Facebook account was located at **7971 Audubon Ave, Alexandria Virginia** during multiple overnight hours in late February 2022 which indicates O1 is sleeping at the Audubon Ave residence. The electronic device will be referred to as "O1's device" hereinafter.  This information was received subsequent to a real time search warrant service on O1's Facebook account. O1's device was at the Audubon address for multiple nights starting between 02/17/2022 through today's date, 02/22/2022.

The Audubon searches are the direct result of the Facebook profile search, subject to the grounds for suppression identified above.  Additionally, the Audubon search (Ex. 2) relied on the same information from the CI.  This too, for the reasons in Confidential Informant section, *supra*, applies to this warrant as well.  The defense would incorporate it to this section.

Additionally, once a general location was discovered through the improper means listed above, then a search warrant issued without establishing a valid basis to search a specific apartment within the building.  Once a potential building was identified, the following was given as the basis to search apartment #202:

On 02/18/2022 at approximately 08:18 hours, this Detective observed O1 (Perkins) exit **7971 Audubon Ave, Alexandria Virginia** with an unidentified individual. O1 appeared to be wearing the same red knit hat that he wore during the robberies. This Detective and Special Agent Nick Shively of the Federal Bureau of Investigations surveilled O1 to the Wilson Blvd area of Arlington where SA Shively was able to take a photograph of O1 wearing the red knit hat believed to have been worn during the robbery on 02/05/2022.

Surveillance was established on the Audubon Ave address, O1 (Perkins) was observed through video surveillance entering and exiting **7971 Audubon Ave #202, Alexandria Virginia,** multiple times on 02/19/2002 through 02/21/2022.

At the writing of this warrant on 02/22/2022 O1 (Perkins) device was last showing that it is located at **7971 Audubon Ave, Alexandria Virginia.**

The Defendant is claimed to have been at the building in the overnight hours on five days, February 17 to 21.  There is no investigation about whether this was a long term residence, such as who was on the lease, or who else might have been living at the location.  This could have been a family member's home, a significant other, or a friend's place for a short term stay.  The second paragraph's claim of video surveillance of multiple entries and exits to #202 does not give any context for the time spent, when those occurred (such as coming in at night and leaving in the morning) or anything else that would establish a nexus between #202 and it being the residence of the defendant.  There are no other facts about what the video surveillance showed, such as other occupants, times and dates of the entries, or duration of the stay.

Apartment #202 is selected to be the target of the search, as opposed to any of the other apartments in the building, without an investigation that would establish probable cause about whether this apartment, as opposed to another in the building or elsewhere, was one where the defendant was residing or just visiting.  In failing to identify substantial reasons why the apartment targeted was probably the residence of the defendant, the affiant did not develop sufficient facts to create a nexus between what was sought in the search (contraband, evidence of a crime, proceeds) and its presence at #202.  The reasons given in the warrant to believe there would be instrumentalities or

fruits of a crime in a residence do not apply here, when #202 was not established as a residence of the defendant.

Because the two searches of Audubon (Ex. 2 and 3) were tainted by the original search from Facebook, and because the warrant for the first Audubon search, which led to the second, failed to establish a nexus between the crime, defendant, and the place to be searched, those searches ought to be suppressed.

**b. Applicable law regarding probable cause and nexus**

In evaluating an affidavit in support of a warrant to search a specific place, the question "is not whether the target of the search is suspected of a crime, but whether it is reasonable to believe that the items to be seized will be found in the place to be searched." *United States v. Lalor*, 996 F.2d 1578, 1582 (4th Cir. 1993). Courts have upheld search warrants for residences only where "some information links the criminal activity to the defendant's residence." *Id.* at 1583. However, "the nexus between the place to be searched and the items to be seized may be established by the nature of the item and the normal inferences of where one would likely keep such evidence." United States v. Anderson, 851 F.2d 727, 729 (4th Cir. 1988).

In this case, the affidavit for the warrant for Audubon #202 (Ex. 2) failed to establish a nexus between the crimes, evidence of the crimes, and the place to be searched, because it did not establish that the defendant resided at the apartment.

## Conclusion

As a result of these searches, which violated the constitutional rights of the defendant, the United States has obtained evidence, from electronic and media accounts, phones, physical items including clothing, and other data. There have been a number of warrants that followed and were derived from the intial three warrants challenged in this motion. Those warrants and searches are the fruits of those challenged, and ought to be suppressed as well, as well as any other evidence derived from the searches challenged herein.

WHEREFORE, the Court is asked to hold a hearing on this motion, grant this motion, suppress the illegally obtained evidence which resulted from the invalid searches, and provide any other relief that is deemed just and proper.

Rashawn Perkins
By Counsel

_____/S/_____
Bret D. Lee
VSB No. 82337
10521 Judicial Drive Suite 100
Fairfax, Virginia 22030
Phone: (703) 936-0580
bret@bretlee.com

## CERTIFICATE OF SERVICE

I hereby certify that on 8 August 2022, a true copy of the foregoing was filed with CM/ECF system prompting electronic copies to be sent to all counsel of record.

_____/S/_____
Bret Lee