IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA | No. 1:22-cr-114 |
| v. | Hon. Michael S. Nachmanoff |
| RASHAWN TARIQ PERKINS, | Trial Date: September 19, 2022 |
| *Defendant.* | Motions Hearing Date: September 1, 2022 |

**GOVERNMENT'S RESPONSE IN OPPOSITION TO
DEFENDANT'S MOTION TO SUPPRESS UNLAWFUL SEARCHES**

The United States of America, by and through its attorneys, Jessica D. Aber, United

States Attorney for the Eastern District of Virginia, and John C. Blanchard and Nicholas J.

Patterson, Assistant United States Attorneys, respectfully submits this response in opposition to

defendant Rashawn Tariq Perkins' "Motion to Suppress Unlawful Searches" (ECF No. 30) and

Memorandum in Support ("Def.'s Mem.") (ECF 30-1). For the reasons stated below, the motion

should be denied.

**BACKGROUND**

On February 5, 2022, two masked men robbed two convenience stores in the Herndon

area of Fairfax County.[1]  At approximately 5:18 PM, the men entered the 7-Eleven located at

13190 Parcher Avenue, Herndon, Virginia (hereafter "the Parcher 7-Eleven").  One of the men

("O1") produced a firearm and held the salesclerk at gunpoint while the other ("O2") took

---

[1] These robberies did not occur in the incorporated Town of Herndon and therefore were
investigated by the Fairfax County Police Department ("FCPD"), as opposed to the Herndon
Police Department ("Herndon PD"), which is Herndon's independent law enforcement agency.

money from the cash registers.  Roughly ten minutes later, O1 and O2 entered the Sunoco gas station located at 13470 Coppermine Road, Herndon, Virginia (hereafter "the Coppermine Sunoco") where O1 again held the salesclerk at gunpoint while O2 took cash from the register. Neither O1 nor O2 was apprehended by law enforcement that evening.

Security video footage from the Parcher 7-Eleven and the Coppermine Sunoco provided clear images of O1 and O2.  O1 was a light-skinned black male who appeared to be in his twenties and had a medium height and a medium build.  O1 was wearing: (a) distinctive red, black, and white "AIR" sneakers; (b) dark pants; (c) a dark hooded sweatshirt bearing the word "adidas" and an "Adidas" logo in white; (d) a black balaclava; and (e) a red knit cap.  O2 was a black male who also appeared to be in his twenties and had a tall height and a thin build.  O2 was wearing: (a) dark sneakers with white soles, edges, and tongues; (b) gray and black pants; (c) a dark hooded sweatshirt with a white "Play Station" logo on the front, white writing on the sleeves, and a white Play Station logo on the back; and (e) a black balaclava.

On February 7, 2022, Detective Eliezer Calo of the Herndon Police Department received information concerning the perpetrators of the robberies from a source who had provided him with information that he had deemed credible in the past.  Detective Calo relayed that information to Detective Jeffrey Andrea of the FCPD, who had been assigned as lead detective for both robberies.  On February 10, 2022, Detective Calo met with Detective Andrea and Special Agent Shively of the Federal Bureau of Investigation ("FBI") and discussed the information his source had given him.  Later that day, Detective Calo and Special Agent Shively met with the source, who provided them with additional information about the perpetrators of the robberies.  The CI was found murdered the following evening.  Detective Andrea never met with or spoke to the CI before he was killed.

2

On or about February 14, 2022, Detective Andrea sought and obtained a search warrant for real-time location data associated with Perkins' Facebook account pursuant to Va. Code § 19.2-70.3(C).  *See* Ex. 1.  In doing so, Detective Andrea described what transpired during each robbery and provided a description of the perpetrators and their clothing.  Detective Andrea further stated the following:

> On or about 02/07/2022, a confidential informant, who will be referred to as CI hereinafter, relayed to law enforcement that they knew O1 and O2 and that they (O1 and O2) robbed the 7-11 and Sunoco on 02/05/2022.  The CI has provided information in the past that was proven to be credible and reliable.  The CI provided information on the offender's social media profiles.  The CI stated on the day of the robbery, O1 showed her/him a handgun and told her/him that they (O1 and O2) were going to do a robbery.  The CI stated O1 was wearing a black sweatshirt, something red on his head and red and black shoes which is what O1 wore during the robberies.  The CI stated O1 always has a red hat or something red.  The CI also stated O1 and O2 went to the McDonalds located at 1071 Elden St, Herndon, VA after the robberies and counted they money they stole during the robberies.  The CI also stated O1 and O2 drive an older model white Toyota.  Law Enforcement database [sic] revealed that O2 is associated with a white 2005 Toyota bearing VA tag [**redacted**].  The vehicle is registered to [**O2's mother at her address**].
>
> O1 was identified as Rashawn Tariq Perkins with a DOB of [**redacted**].  Perkins has a picture of himself on Facebook wearing the same distinctive red, black, and white "AIR" sneakers as the ones worn by O1 during both robberies on 02/05/2022.  Additionally, Perkins physical description matches the description of O1.  A criminal history check of O1 revealed that he is a (4X) Convicted Felon with multiple arrests to include; Possession of a Firearm by a Convicted Felon; Credit Card Theft; Felony Receiving Stolen Property; Credit Card Fraud; Credit Card Forgery; Grand Larceny; Possession of Narcotics; Probation Violation; Destruction of Property; Contempt of Court; Assault; Petit Larceny.  Perkins face book [sic] handle is "[**redacted**]" Facebook account – **HTTPS://[redacted]**.

In the same affidavit, Detective Andrea further provided a Fairfax County Circuit Court Judge with information about Facebook, the type of data Facebook collects and retains, and stated that

he believed obtaining such data could assist in locating Perkins and potentially result in the recovery of evidence.  The judge authorized the search warrant and the installation of a pen-trap on Perkins' Facebook account.

On or about February 22, 2022, Detective Andrea sought and obtained a search warrant for Perkins' apartment.  *See* Ex. 2.  In doing so, Detective Andrea repeated the information that had been provided by the CI and relayed to him.  However, he added information concerning the second individual named by the CI matching O2's description and included pictures from Perkins' Facebook and Instagram establishing (a) Perkins' resemblance to O1, and (b) the resemblance of Perkins' clothing to that of O1.  Detective Andrea included information provided by Meta Platforms about a device connected to Perkins' Facebook being at an apartment building for five nights in a row.  He added that he personally observed Perkins exit that apartment building wearing what appeared to be the same red knit hat worn by O1 during the robberies.  He explained that he and Special Agent Shively physically surveilled Perkins to Arlington and that Special Agent Shively obtained a picture of Perkins wearing that red knit hat.  He added that law enforcement established video surveillance at the above apartment building and that Perkins was captured on video entering and exiting Apartment 202 multiple times over the course of several days.

When the FCPD executed the aforementioned residential search warrant the next morning, Perkins was seen (and captured by an officer's bodycam) throwing a firearm out of his window.  The firearm was recovered and found to closely resemble the firearm used in the robberies of the Parcher 7-Eleven and the Coppermine Sunoco.  Perkins admitted to throwing the firearm out the window because he was a convicted felon.  FCPD detectives conducted a search of Perkins' residence and located shoes, a sweatshirt, a hat, and a balaclava visually consistent

with those worn by O1 during the robberies.  However, in searching for that evidence, other FCPD detectives began to discover other distinct clothing articles and shoes consistent with those worn by an armed robbery suspect in multiple other unsolved cases.  Detective Joseph Shifflett sought and obtained another search warrant authorizing the police to search for evidence pertinent to those robberies.  *See* Ex. 3.  They seized those items as well.

## ARGUMENT

Perkins has moved to suppress evidence obtained from three search warrants issued by Fairfax County Circuit Court judges issued prior to the United States' adoption of his local charges and its indictment of others, namely: (1) the February 14, 2022, search warrant for data, including real-time location data, from Meta Platforms, Inc. (hereinafter, "the Facebook Search Warrant"); (2) the February 22, 2022 search warrant for Perkins' apartment (hereinafter, "the First Apartment Search Warrant"); and (3) the February 23, 2022 search warrant for Perkins' apartment (hereinafter, "the Second Apartment Search Warrant").

Perkins claims that the affidavits in support of at least two of the warrants[2] contained intentionally or recklessly false statements and omissions that were material to their issuing judges' determinations of probable cause.  Def's Mem. at 1-2.  Perkins argues that he is entitled to a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978), at which he will prove *Franks* violations requiring the suppression of the fruits of those searches because the warrants would have been devoid of probable cause but-for the affiants' misrepresentations and omissions.  *Id.* Perkins further asks the Court to suppress evidence obtained from the Facebook Search Warrant

---

[2] In Perkins' motion and the introduction to his supporting memorandum, he alleges that all three affidavits contained material falsehoods or omissions.  *See* ECF No. 30 at 1, Def's Mem. at 1-2. However, the affidavit in support of the Second Apartment Search Warrant authored by Detective Shifflett makes no mention of the CI or statements made by the CI, and Perkins fails to identify any alleged false statements or reckless omissions in that affidavit.

because that warrant was overbroad.  *Id.* at 12-18.  Finally, he contends that evidence obtained during law enforcement's search of his apartment should be suppressed for three reasons, namely: (1) the First and Second Apartment Search Warrants were tainted by the improperly issued Facebook Search Warrant, *id.* at 19, 21; (2) the First Apartment Search Warrant failed to establish a nexus between Perkins, the crimes under investigation, and the place to be searched, *id.* at 19-21; and (3) the allegedly deficient First Apartment Search Warrant led to the Second Apartment Search Warrant.  *Id.* at 21.

     None of Perkins' arguments has merit.  As discussed further below, Perkins is not entitled to a *Franks* hearing because he has failed to carry his burden of making a substantial preliminary showing that any information purportedly omitted from any of the search warrants was both (1) omitted intentionally to mislead or with the subjective belief that its inclusion would negate probable cause and (2) of such significant materiality that its inclusion would in fact have negated probable cause.  Moreover, his remaining arguments regarding probable cause are unavailing and, in any event, the attenuation doctrine and the good faith exception to the exclusionary rule would apply to the First and Second Apartment Search Warrants.

## I.   THE DEFENDANT IS NOT ENTITLED TO RELIEF PURSUANT TO *FRANKS V. DELAWARE*

     The Court should not suppress any evidence obtained as a result of the Facebook Search Warrant, the First Apartment Search Warrant, or the Second Apartment Search Warrant.  Neither Detective Andrea nor Detective Shifflett intentionally or recklessly omitted information from their affidavits that, if included, would have defeated probable cause and prevented any of the warrants from issuing.

**A.  Statement Of The Law**

1.  Legal Standard for Validity of a Warrant

The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause,

supported by Oath or affirmation, and particularly describing the place to be searched, and the

persons or things to be seized."  U.S. Const. amend. IV.  Probable cause "deals with probabilities

and depends on the totality of the circumstances – it is not a high bar."  *District of Columbia v.*

*Wesby*, 138 S.Ct. 577, 586 (2018) (citations omitted).  Probable cause to search is "a fair

probability that contraband or evidence of a crime will be found in a particular place."  *Illinois v.*

*Gates*, 462 U.S. 213, 238 (1983).  Probable cause "is a fluid concept—turning on the assessment

of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set

of legal rules" and thus requires a "totality of the circumstances" analysis.  *Id.* at 232, 238.  The

probable cause standard does not

> require officials to possess an airtight case before taking action.  The
> pieces of an investigative puzzle will often fail to neatly fit, and
> officers must be given leeway to draw reasonable conclusions from
> confusing and contradictory information, free of the apprehension
> that every mistaken search or seizure will present a triable issue of
> probable cause.

*Taylor v. Farmer*, 13 F.3d 117, 121-22 (4th Cir. 1993).  As in this case, "the nature of the

unlawful activity alleged, the length of the activity, and the nature of the property to be seized"

must be assessed to determine probable cause.  *United States v. Richardson*, 607 F.3d 357, 370

(4th Cir. 2010).

Recognizing that reasonable minds may differ regarding whether a particular affidavit

establishes probable cause, the Supreme Court "concluded that the preference for warrants is

most appropriately effectuated by according 'great deference' to a magistrate's determination."

*United States v. Leon*, 468 U.S. 897, 914 (1984) (quoting *Spinelli v. United States*, 393 U.S. 410,

419 (1969); *see also United States v. Grossman*, 400 F.3d 212, 217 (4th Cir. 2005); *United States v. Blackwood*, 913 F.2d 139, 142 (4th Cir. 1990).  The affidavit submitted in support of the search warrant application is presumed valid.  *Franks v. Delaware*, 438 U.S. 154, 171 (1978).  "[T]he task of a reviewing court is not to conduct a *de novo* determination of probable cause, but only to determine whether there is substantial evidence in the record supporting the magistrate's decision to issue the warrant."  *Massachusetts v. Upton*, 466 U.S. 727, 728 (1984).  "When reviewing the probable cause supporting a warrant, a reviewing court must consider only the information presented to the magistrate who issued the warrant."  *United States v. Wilhelm*, 80 F.3d 116, 118 (4th Cir. 1996) (citing *Blackwood*, 913 F.2d at 142).

During the warrant application process, affidavits are "normally drafted by non-lawyers in the midst and haste of a criminal investigation."  *United States v. Moody*, 931 F.3d 366, 372 (4th Cir. 2019) (quoting *United States v. Ventresca*, 380 U.S. 102, 108 (1965)).  Thus, an affiant cannot be expected to include in an affidavit every piece of information gathered in the course of an investigation.  *United States v. Colkley*, 899 F.2d 297, 300 (4th Cir. 1990).  Moreover, because a probable cause determination involves no definitive adjudication of innocence and guilt, and because the consequences of arrest or search are less severe and irremediable than the consequences of an adverse criminal verdict, the Fourth Amendment does not require an affiant to include all potentially exculpatory evidence in an affidavit offered during the warrant process.  *Id.* at 302.

## 2.  Legal Standard of a *Franks* Challenge.

Perkins seeks an evidentiary hearing regarding the veracity of statements made in the affidavits in support of the search warrants at issue pursuant to *Franks v. Delaware*.  "An accused is generally not entitled to challenge the veracity of a facially valid search warrant

affidavit." *United States v. Allen*, 631 F.3d 164, 171 (4th Cir. 2011).  In *Franks*, however, the

Supreme Court held that a defendant may challenge an affidavit offered to procure a search

warrant under limited and carefully circumscribed circumstances.  *Franks*, 438 U.S. at 167, 171

(recognizing a strong "presumption of validity with respect to the affidavit supporting the search

warrant" and creating a rule of "limited scope").  Defendants seeking relief or even a hearing

pursuant to *Franks* must make a "dual showing . . . which incorporates both a subjective and an

objective threshold component" that overcomes the presumption of the search warrant's validity.

*Colkley*, 899 F.2d at 300.  To be entitled to a *Franks* hearing,

> the accused must make a substantial preliminary showing that false
> statements were either knowingly recklessly included in an affidavit
> supporting a search warrant *and* that, without those false statements,
> the affidavit cannot support a probable cause finding.  Therefore, if
> the allegedly false statements are not necessary for the probable
> cause finding, the accused is not entitled to a *Franks* hearing."

*Allen*, 631 D.3d at 171.  Thus, *Franks* requires proof of both intentionality and materiality.

*United States v. Lull*, 824 F.3d 109, 114 (4th Cir. 2016).

The Fourth Circuit has explained that "the defendant's burden is a heavy one" and that

"[w]ith the defendant's burden in attacking a search authorized by a facially valid warrant so

heavy, so too is his burden in establishing the need for a hearing on the issue."  *United States v.

Jeffus*, 22 F.3d 554, 558 (4th Cir. 1994).  In *Colkley*, the Fourth Circuit applied *Franks* to

intentional, material omissions.  "When a defendant relies on an omission, this heavy burden is

even harder to meet."  *Id.*  In the context of an omission, "a defendant must provide a substantial

preliminary showing that (1) law enforcement made an omission; (2) law enforcement made the

omission 'knowingly and intentionally, or with reckless disregard for the truth,' and (3) the

inclusion of the omitted evidence in the affidavit would have defeated its probable cause."  In

assessing materiality, a reviewing court should "insert the facts recklessly [or intentionally]

omitted, and then determine whether or not the corrected warrant affidavit would establish probable cause." *United States v. Wharton*, 840 F.3d 163, 169 (4th Cir. 2016).  If the corrected warrant affidavit establishes probable cause, there is no *Franks* violation.  *Miller v. Prince George's County*, 475 F.3d 621, 628 (4th Cir. 2007).  If after the hearing the defendant establishes 'perjury or reckless disregard' by a preponderance of the evidence and shows that the inclusion of the omitted evidence would defeat the probable cause in the affidavit, 'the search warrant must be voided and the fruits of the search excluded.'" *United States v. Haas*, 986 F.3d 467, 474 (4th Cir. 2021).

### B.  The Facebook Search Warrant

#### 1.  Detective Andrea's Omission of Information He Did Not Know Was Neither Intentional Nor Reckless

Perkins argues that Detective Andrea intentionally or recklessly "did not disclose several critical facts bearing on the reliability of the CI or of the investigation that followed" in the affidavit supporting the Facebook Search Warrant.  Def.'s Mem. At 6.  The first fact Detective Andrea is accused of intentionally or recklessly omitting from the affidavit is that a different detective from a different law enforcement agency had deemed the CI unreliable due to that detective's belief that the CI had falsely denied gang membership/association when seeking immigration status.[3]  This argument is plainly erroneous because "[a]n officer who does not personally know information cannot intentionally or recklessly omit it."  *United States v. Pulley*, 987 F.3d 370, 379 (4th Cir. 2021).  The Fourth Circuit has made it clear that other law enforcement officers' knowledge is irrelevant to the determination of whether an officer-affiant

---

[3] The undersigned Assistant spoke with Det. McManus on August 9, 2022 after he returned to the country from vacation.  Det. McManus explained that he had worked with an ICE agent and that the CI's asylum case had been reopened based on information concerning his gang membership/association and criminal activities.

omitted information from a warrant affidavit intentionally or recklessly. *See id.* (holding that "the collective knowledge doctrine cannot apply in the *Franks* context" because "[t]he *Franks* inquiry is designed to identify intentionality or reckless disregard *on the part of the affiant*)(emphasis added)).

In this case, Perkins is accusing Detective Andrea of intentionally or recklessly omitting information about the CI he did not learn until *after* obtaining and executing the search warrant at issue.  Citing to a disclosure letter government counsel sent defense counsel, Perkins states that "[t]he Government has made representations regarding Agent Shively and Detective Calo, but has not made any representations regarding what the affiant, Detective Andrea of Major Crimes, knew, or the basis for his knowledge." (Def's Mem. at 7).  This is simply incorrect.  In its disclosure letter (which the defendant quotes in his memorandum), the government clearly stated that

> **[a]fter Mr. Perkins and [F.B.][4] were arrested and their residences were searched, the FCPD detectives investigating Mr. Perkins** and Special Agent Shively learned that a different Herndon detective (Det. McManus) did not believe J.G.A.V. to have been a reliable source because J.G.A.V. had previously denied gang membership/association when completing sworn immigration paperwork and Det. McManus knew J.G.A.V. to be an MS-13 member/associate.  **Neither the FCPD detectives nor Special Shively were aware of this information prior to Mr. Perkins and [F.B.] being arrested** (emphasis added).

Perkins knows that Detective Andrea is a FCPD detective and that Detective Andrea was the lead FCPD detective investigating him for both February 5 robberies.  Neither Detective Andrea, nor Detective Shifflet, nor any of the other FCPD detectives assigned to robbery cases in

---

[4] F.B. was the individual the CI identified as O2.  Per DOJ policy, the government is not naming F.B. because he has not been charged federally in this case.  The United States would request that his mother's name, his mother's vehicle's license plate, and his mother's address be redacted from pages 5 and 9 of ECF No. 30 and that his name be redacted from page 8 of ECF No. 30-3.

which Mr. Perkins is considered a suspect knew that Detective McManus believed the CI had

been untruthful in immigration court or thought the CI was unreliable until Perkins' residence

was searched and he was arrested.

Perkins next argues that Detective Andrea's failure to include information of which he

was unaware in his search warrant affidavit means that "either the truthfulness of the CI had not

been investigated by [Detective Andrea], or that [Detective Andrea] acted with reckless

disregard for the truth."  Def's Mem. at 8.  Perkins' suggestion that he is somehow entitled to

*Franks* relief because Detective Andrea neglected to sufficiently investigate the CI's veracity

fails because "'[a]llegations of negligence . . . are insufficient' to require a *Franks* hearing."

*Haas*, 986 F.3d at 477.  Perkins' belief that Detective Andrea should have possessed knowledge

that another detective did is irrelevant to the court's inquiry because "[w]hat the officer-affiant

*should* have known does not matter if he did not *in fact* know."  *Pulley*, 987 F.3d at 377.

"Reckless disregard is a subjective inquiry; it is not negligence nor even gross negligence."  *Id.*

2.  Detective Andrea Did Not Intentionally or Recklessly Omit Information
About the CI's Reliability Material to the Finding of Probable Cause

Perkins next claims that Detective Andrea intentionally or recklessly omitted statistics

about the CI's track record as a law enforcement source necessary to the judge's assessment of

the CI's reliability.  Def's Mem. at 8.  Perkins complains that the affidavit does not contain "a

statement about how many cases, arrests, or verified disclosures had been made by the CI" and

that "[t]here is no support to say how or why the CI is reliable and how that is known to the

affiant" beyond a "boilerplate recitation that the CI provided information in the past that was

proven to be credible or reliable."  *Id.*  Here, Perkins is reading directly from the *Haas*

defendant's playbook and making an argument that does not hold water.

In *Haas*, the district court denied both of the defendant's requests for a *Franks* hearing that he based on purported omissions from search warrant affidavits. *Haas*, 986 F.3d at 474. One of these purported omissions concerned the affidavit's lack of "information about the source's reliability as a confidential informant, including the (unidentified) outcomes that resulted from her prior work with law enforcement." *Id.* at 475. The Fourth Circuit affirmed the district court's denials of the defendant's motions. The court found that the defendant's claim concerning the dearth of information about the source's history of reliability "fail[ed] at the outset" because he failed to allege specific instances where the source had provided misinformation in the past. *Id.* at 475 (citing *Moody*, 931 F.3d at 371 (a "defendant must provide facts – not merely conclusory allegations – indicating that the officer subjectively acted" improperly)). The court explained that in the absence of evidence that the source had consistently provided misinformation in the past and that the officer-affiant was aware of that fact, the defendant's argument did not warrant a *Franks* hearing. *Id.* at 475.

The Court should apply the same rationale here that the Fourth Circuit applied in *Haas*. Here, like the defendant in *Haas*, Perkins argues that the officer-affiant should have provided details about the outcomes of the source's prior work with law enforcement but offers nothing more than merely "conclusory allegations." Perkins does not establish that the CI had provided misinformation in the past and – more importantly – does not show that Detective Andrea was aware of the CI having done so. Unlike police officers, criminals (and their activities) are not confined to particular precincts, districts, counties, states, or even countries. Information about criminal activities is frequently received by and relayed from one law enforcement agency to another. In this case, Detective Calo of the Herndon Police Department passed information along to Detective Andrea that he believed may help a fellow investigator in a neighboring

13

jurisdiction.  Detective Andrea presented the information he had at the time, which as far as he knew came from a source with a history of providing credible information to law enforcement in the past, to a Circuit Court judge.  He obtained a warrant and then learned later that a different detective did not believe the CI was trustworthy.  There is simply no *Franks* violation here.

Perkins continues to follow in the *Haas* defendant's footsteps by pointing to a lack of corroborating evidence of the CI's claims in the affidavit in support of the Facebook Search Warrant.  Def's Mem. at 8-10.  The *Haas* defendant similarly tried to invalidate search warrant affidavits by citing to the officer-affiant's omission of evidence that would corroborate information provided by a source.  *Haas*, 986 F.3d at 475.  The Fourth Circuit found that this "purported omission, additional corroborating evidence, fail[ed] for a more fundamental reason," namely: at bottom, the argument that an affidavit lacked evidence corroborating a source's claim is really an argument that the warrant affidavit lacked probable cause, and "the presence (or absence) of probable cause is not the proper subject of a *Franks* hearing."  *Id.*

      3.  <u>Detective Andrea Did Not Intentionally or Recklessly Omit Information<br>Concerning the McDonalds Security Video Footage, and None of that<br>Information Was Material to the Judge's Finding of Probable Cause</u>

Perkins' arguments concerning video footage from the Elden Street McDonalds are a bit murky.  While he argues that Detective Andrea made a "material misrepresentation," *see* Def's Mem. at 10, the crux of Perkins' argument seems to be that the Fairfax County Circuit Court was misled into believing probable cause existed by Detective Andrea's failure to include information about security video footage from the McDonalds in his affidavit.  Because Perkins' allegations fail to make a prima facie showing as to at least one, if not both, of the required elements, the Court should deny his request for a hearing.

14

Prior to obtaining the Facebook Search Warrant, Detective Andrea went to the Elden Street McDonalds where the CI said he saw Perkins and O2 on the date of the robberies. McDonalds employees allowed Detective Andrea to review security video footage from the afternoon of February 5, 2022 on the restaurant's monitor.  Detective Andrea does not recall watching any footage captured after the robberies.  As Perkins' arguments are rooted in the footage, it is important to understand what the footage shows.[5]  The footage shows an individual who appears to be F.B.[6] (whom the police believed to be O2) pull into the McDonalds parking lot in a late model white sedan ("Car 1") at approximately 3:14 PM on February 5, 2022 and subsequently enter the McDonalds.  Roughly one minute later, a second white sedan ("Car 2") arrived, and a male subject exited Car 2 and entered the McDonalds.  The video shows F.B. spoke with various people inside and outside the McDonalds, including an individual who, based on his appearance, could be the CI.  Neither F.B. nor anyone else in the restaurant was wearing an outfit worn by O1 or O2 during the robberies.  Two of the males with whom F.B. interacted eventually walked away on foot behind a dumpster, with one of them wearing a backpack and

---

[5] The United States wishes to clarify Perkins' characterization of the telephone conversation about this footage.  Perkins claims that "[i]n a discussion with counsel for the United States on August 8, 2022, *it was disclosed that there is a video* that potentially shown a person" who could be Perkins on the evening of February 5, 2022.  Def's Mem at 10, fn 4 [emphasis added].  On the afternoon of August 8, 2022, defense counsel called the undersigned Assistant and asked questions about what could or could not be seen in the McDonalds video footage he had been provided on July 18, 2022 after the FBI had obtained a copy of the footage.  While on the phone with defense counsel, the undersigned Assistant pulled up the video footage and discussed with him timestamps and descriptions from notes taken during his own review of the footage and answered defense counsel's questions.

[6] An individual who appears to be F.B. can be seen in the footage, though the identities of other male subjects he is with cannot be discerned due to the quality of the video.  It should further be noted that after being arrested at the local level, F.B. admitted to being at the McDonalds on the date in question.  F.B. further admitted that Perkins was counting approximately $400 to $500 inside the McDonalds but claimed to not know where they money came from.  Accordingly, the government feels confident referring to the individual in the footage as F.B.

seeming to struggle to carry a large bag.  F.B. then got into into the driver's seat of Car 2 and drove two other males away, leaving Car 1 (in which he had arrived) in the McDonalds parking lot for several hours.

The footage recorded after the robbery, which Det. Andrea does not recall reviewing, further shows F.B. and one of the individuals with whom he had left earlier that afternoon returned to the McDonalds.  They entered the McDonalds through a rear door at approximately 6:40 PM and proceeded directly to the restroom.[7]  A third individual who, based on his appearance, could be the CI, can be seen entering the McDonalds at approximately 6:45 PM and is visible on camera for approximately two seconds before joining F.B. and the other subject in the restroom.  The individual matching the CI's description can be seen leaving the restroom at approximately 6:50 PM and reentering the restroom approximately 90 seconds later.  F.B., the individual matching the CI's description, and the other subject all exited the restroom at approximately 6:54 PM and were visible on camera for approximately two seconds before proceeding out the rear door.

The government agrees that Perkins has identified specific facts that were not included in Detective Andrea's affidavit: namely, that Detective Andrea had reviewed the McDonald's footage and the footage does not depict anyone wearing clothing matching the robbers' outfits.  Based on conversations with Detective Andrea, the government does not agree that this omission was made with the requisite intentionality or reckless disregard required for a *Franks* violation.[8]

---

[7] F.B. is visible on camera for approximately two seconds before entering the restroom.  The other subject is on camera for approximately 28 seconds before joining F.B. in the restroom.

[8] To obtain a *Franks* hearing, a defendant must first adequately allege that an omission was either intentionally to mislead or with reckless disregard, *i.e.*, that at minimum an officer "fail[ed] to inform the magistrate of facts [he] subjectively knew would negate probable cause." *Haas*, 968 F.3d at 475.

Although the government does not believe the omitted material is of such a significance as to warrant any inference of subjective bad faith, the government also recognizes that questions of intent may create a close call for the Court to resolve on the papers without an evidentiary hearing. *See, e.g.*, *Haas*, 986 F.3d at 477 (noting that the standard is not what a reasonable officer should have done and finding *Franks* hearing unwarranted when omitted information did not "so undermine[] [the informant's] credibility that we otherwise question the agent's subjective intent"). To the extent the Court concludes a hearing and credibility determinations are necessary to resolve this question, the United States will present evidence in the form of Detective Andrea's testimony that will show this fact's omission was not due to any improper motive.

But even if the Court believes the intent question is a close call or warrants a hearing, defendant's allegations fail on the second required element: that the omitted material would have in fact negated probable cause if it had been included in the affidavit. *See Haas*, 986 F.3d at 474 (noting that a defendant must make a substantial preliminary showing that the omitted information would have defeated probable cause). Because the standard for obtaining a *Franks* hearing requires a prima facie showing on both elements, should the Court agree with the government that the omitted information would not have defeated probable cause, the Court need not resolve whether defendant made a prima facie showing as to intent.

At best for the defendant, the video footage undercuts the informant's testimony that he saw O1/Perkins wearing the same clothes worn by O1 during the robberies, which may have called his credibility into question. But the informant also provided Detective Andrea with Perkins' social media profiles, and on Perkins' Facebook profile, Detective Andrea found Perkins wearing distinct shoes identical to those O1 wore in both robberies. Likewise, the

footage corroborated that the CI saw F.B. and another subject who could have been Perkins at the McDonalds before and after the robbery and that F.B. was driving a vehicle consistent with the description provided by the CI.[9]  In other words, while as a matter of best practices the detective should have disclosed any inconsistencies that were apparent to him, the information is not of such an exculpatory quality—particularly in light of the other corroboration and, as far as Detective Andrea knew, the informant's past reliability—that it gives rise to any inference that Detective Andrea subjectively knew that its inclusion would have defeated probable cause.  Nor would it have negated probable cause as a practical matter.  A known and reliable confidential informant who reports explicit conversations about robberies and whose identifications are corroborated by external details (including the Facebook photos and vehicle descriptions and registrations) amply establishes the minimum requirements of "only the probability, and not a prima facie showing, of criminal activity" necessary to obtain a warrant.  *Gates*, 462 U.S. at 235.  Perkins focuses on the corroboration – or lack thereof – of "incriminating facts" but fails to mention that "when evaluating probable cause based on source information, corroboration of "innocent facts" provided by an informant may be sufficient and it is not necessary that there be corroboration of the criminal conduct itself.  *Alabama v. White*, 496 U.S. 325, 331-32 (1990).  Detective Andrea mentioning that the CI appeared to be incorrect as to one fact would not have defeated probable cause.

Perkins next argues that Detective Andrea's failure to watch McDonald's security video footage recorded after the robberies on February 5 is somehow a material misrepresentation or omission.  *See* Def's Mem. at 10, ¶ 2 and fn. 4.  The argument that Detective Andrea's failure to

---

[9] The CI had stated that F.B. drove a late model Toyota sedan.  It should further be noted that Detective Andrea, as discussed in his affidavit in support of the First Apartment Search Warrant, queried law enforcement databases and confirmed that F.B. was associated with a 2005 Toyota sedan registered to a woman with F.B.'s last name and a local address.

mention that he had not watched footage recorded after the robbery constituted an intentional or reckless omission of a fact critical to the Circuit Court's finding of probable cause makes no sense.  Based on a fair reading of the affidavit in support of the Facebook Search Warrant (and the affidavit in support of the First Apartment Search Warrant), the Circuit Court had no reason to believe Detective Andrea had watched any footage from the McDonalds whatsoever. However, had Detective Andrea mentioned he had reviewed footage from McDonald's prior to the robberies, stated what it showed, and then stated he had not seen footage from later that evening, probable cause would have existed and the warrant would have issued.  Even if Detective Andrea *had* watched the footage recorded after the robberies, that footage does not contradict the CI as Perkins suggests.  Had the CI's interaction with F.B. been at the sales counter, a table, or any other part of the establishment covered by a security camera and no footage existed of money being counted in the CI's presence, the defendant's argument would be more persuasive.  However, as detailed *supra*, of the approximate 14 minutes and 25 seconds that F.B. and the second subject are inside the McDonalds, they are in the restroom nearly the entire time and are only visible on camera for a matter of seconds.

Detective Andrea could not have included in his affidavit information about the CI's background, or beliefs held by another detective, of which he was unaware.  He did not omit any information material to probable cause from his affidavit, and any omissions were not motivated by any desire to intentionally or recklessly trick a judge into authorizing a warrant he or she would not have otherwise.  Furthermore, had Detective Andrea included the fact that one of the statements made by the CI was contradicted by the footage he had seen, probable cause still would have existed to support the warrant.  This is particularly true considering that the affidavit

also states that Perkins matches O1's physical description, owned the same distinctive[10] sneakers worn by O1 during the robberies, and – particularly relevant to an armed robbery investigation – was a four-time convicted felon with a criminal history that involved theft and firearms.

### C.  The First Apartment Search Warrant

Perkins argues that evidence obtained as a result of the First Apartment Search Warrant should also be suppressed pursuant to *Franks*.[11]  This argument is unconvincing.  Even if the Court were to find that Detective Andrea intentionally or recklessly omitted information necessary to the Circuit Court's finding of probable cause when he obtained the Facebook Search Warrant, the affidavit for the First Apartment Search Warrant contains significantly more information in support of probable cause than that used to obtain the Facebook Search Warrant. For example, the First Apartment Search Warrant includes: information that both Perkins and F.B. fit the descriptions of O1 and O2; side-by-side comparison photos[12] taken from store security footage and Perkins' social media accounts showing Perkins' shoes, hat, mask, and face;

---

[10] Perkins claims that the sneakers were not distinctive because they are commercially available. Def's Mem. at 5-6.  A review of the sources to which he has cited reveals that they are offered for sale in a variety of color ways.  The United States has included a side-by-side comparison of O1 wearing these sneakers in the red, black, and white color way and Perkins wearing sneakers that appear to be of the same make, model, and color way.  See Ex. 4.  These shoes are far more distinctive than generic work boots, light or dark sneakers, or other common clothing articles.

[11] Perkins says that the search of the defendant's residence "relied on the same information from the CI."  Def's Mem. at 19.  "This too, for the reasons in [sic] Confidential Informant section, *supra*, applies to this warrant as well."  *Id.*  "The defense would incorporate it to [sic] this section." The United States takes this to mean that Perkins is incorporating his earlier *Franks* argument by reference and is therefore alleging that the First Apartment Warrant would also not have issued had Detective Andrea included the information Perkins raised in his attack of the Facebook Search Warrant.

[12] Colorized photos were included in the original affidavit provided to the Fairfax County Circuit Court.  The executed copy, appended hereto, contains black-and-white versions.  However, colorized versions of these photos can be seen in the Affidavit in Support of the Criminal Complaint in this case (ECF No. 2).

and information that investigators physically surveilled Perkins and photographed him wearing a hat consistent with the hat worn by O1 during the February 5, 2022 robberies.  The inclusion of the fact that the CI had incorrectly described the clothing F.B. and (presumably) Perkins were wearing prior to the robberies would not have vitiated probable cause, and the First Apartment Search Warrant would have issued regardless.

### D.  The Second Apartment Search Warrant

As mentioned *supra*, Perkins initially suggests that he is moving to suppress evidence obtained as a result of all three search warrants at issue because the affidavits supporting each warrant contained material falsehoods or omissions.  However, he does not identify any false statements or material omissions made intentionally or recklessly by Detective Shifflett in the affidavit he authored to obtain the Second Apartment Search Warrant.

## II.   THE FACEBOOK SEARCH WARRANT WAS NOT OVERBROAD, AND THE POLICE REASONABLY RELIED ON IT

### A.  Ample Probable Cause Supported the Facebook Search Warrant

Perkins also argues that the Facebook Search Warrant was overbroad.  Def's Mem. at 12-13, 18.  For reasons that are not entirely clear, he provides the Court with an overview of cases in which the Supreme Court has ruled that search warrants are required to search people's electronic devices and actively track their whereabouts.  *Id.* at 13-17.  Perkins essentially argues that continually tracking someone's location and reading their private conversations are invasive investigatory methods, that police should not be allowed to utilize such methods based on "mere suspicion," and that probable cause was lacking to allow law enforcement to utilize these methods for the 30-day period authorized by the Fairfax County Circuit Court.  *Id.* at 18.

The government agrees that people have important privacy interests in their smart phones and social media accounts.  That said, Perkins' arguments should be rejected.  The police cannot

and did not obtain authorization to track Perkins' Facebook activations and read his messages based on "mere suspicion." The did so upon a showing of probable cause to a Circuit Court judge in accordance with the Fourth Amendment's warrant requirement.

The Supreme Court has held that police may search for "mere evidence" in which case "probable cause must be examined in terms of cause to believe that the evidence sought will aid in a particular apprehension or conviction." *Andresen v. Maryland*, 427 U.S. 463, 483 (1976). A fair reading of the search warrant papers reveals that probable cause existed for the types of information requested from Facebook, all of which is relevant to establish, *inter alia*: (1) Perkins' identity and aliases, along with the identity of other co-conspirators and witnesses; (2) the relationships, contacts, and communications amongst Perkins and co-conspirators and/or witnesses; (3) the substance of communications, which may contain incriminating statements made by Perkins or others; (4) the date, time, and location of where Perkins was and is during relevant events; (5) visual depictions of Perkins and co-conspirators, including articles of clothing consistent with clothing items worn by the perpetrators of robberies; (6) information about linked accounts that could further aid in determining identity through subsequent search warrants; and (7) user attribution evidence to ensure that the target under investigation was in fact the individual using the account and posting messages/images as opposed to someone else using or hacking into the account.

Courts have upheld warrants authorizing the seizure of these types of information. *See e.g., Young,* 260 F. Supp. 3d at 550 (Judge Brinkema noting that courts have routinely upheld warrants authorizing the seizure of information related to potential sources of evidence, including, *inter alia*, aliases used by the defendant, other internet accounts, and other physical places where the target might have hidden evidence); *United States v. Skinner*, 2021 WL 1725543, at *12

(E.D.Va. Apr. 29, 2021) (rejecting argument that law enforcement's search tied to location, shopping history, and online communications were overbroad, noting such information was relevant to the charges and were cabined by reference to the statutes stated in the warrant); *United States v. Aboshady*, 951 F.3d 1, 8-9 (1st Cir. 2020) (rejecting arguments that searches for identity evidence showing ownership and control of six g-mail accounts belonging to the defendant was constitutionally impermissible).

Although the government has not located a decision from the Fourth Circuit specifically addressing the issue of allegedly overbroad or insufficiently particular Facebook searches, other courts have denied motions to suppress based on similar arguments. *See, e.g., United States v. Liburd*, 2018 WL 2709199, at *3 (E.D.N.Y. June 5, 2018) (holding that due to the nature of digital media searches, it was proper for the search warrant to allow the FBI to search the entire contents of a defendant's Facebook account once a magistrate determined there existed probable cause to believe that evidence relating to criminal activity was contained in that account, even if the account also contained information unrelated to criminal activity); *United States v. Westley*, 2018 WL 3448161, at *12 (D. Conn. July 17, 2018) (in upholding Facebook warrant, equating Facebook information to other "electronic evidence" and asserting that "extremely broad" disclosure is a practical necessity when dealing with electronic evidence); *United States v. Sharp*, 2015 WL 4641537, at *15 (N.D. Ga. Aug. 5, 2015) (rejecting defendant's argument the Facebook search warrant was overbroad where Facebook disclosed the "entire cache of information" without limits based on time, subject matter, or other criteria and stating "[t]he fact that [a] warrant call[s] for seizure of a broad array of items does not, in and of itself, prove that the warrant fails to meet this requirement of particularity.") *see also United States v. Shah, 2015 WL 72118, at (E.D.N.C. Jan. 6, 2015)* ("A number of courts have authorized the government to obtain the entire contents of an

email account to later determine which particular emails come within the scope of a search warrant"); *United States v. Ray*, 2021 WL 2134861, at *25 (S.D.N.Y. May 26, 2021) ("Courts in this Circuit, however, have uniformly held that law enforcement need not rely upon an email host company or any other private party to sift through emails to determine what is relevant and that it may obtain a warrant to request all emails from an account."); *United States v. Alford*, 744 Fed App'x 650, 653 (11th Cir. 2018) (finding warrant requiring disclosure of nearly all the data on a Google account was as limited as possible under the circumstances because officers were attempting to identify an unknown perpetrator linked to the account).

Finally, the 30-day period authorized by the Fairfax County Circuit Court was reasonable. Detective Andrea sought the Facebook Search Warrant pursuant to Virginia Code § 19.2-70.3(c). Virginia Code § 19.2-70.3(J) provides that real-time location data search warrants "shall require the provider to provide ongoing disclosure of such data for a reasonable period of time, not to exceed 30 days" and that the time period may extended in the future for good cause shown. Detective Andrea's request was within the time frame prescribed by Virginia law, and this same 30-day window is routinely used in search warrants issued by judges in the Eastern District of Virginia. The warrant provided the FCPD with sufficient time to conduct its investigation while recognizing Perkins' privacy interests.

### B.  Even if the Facebook Search Warrant was Overbroad, the Good Faith Exception Applies

Under the good faith exception to the Fourth Amendment's exclusionary rule, suppression is not warranted when officers rely in good faith on an objectively reasonable search warrant issued by a neutral and detached judge. *United States v. Leon*, 489 U.S. 897, 900 (1984). This objective standard is measured by "whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." *Id.* at 922, n. 23. "[A]

warrant issued in good faith by a magistrate normally suffices to establish that a law enforcement officer has acted in good faith in conducting the search." *Id.* at 922 (internal quotation marks omitted). The Supreme Court observed that "suppression of evidence obtained pursuant to a warrant should be ordered only on a case-by-case basis and only in those unusual cases in which exclusion will further the purposes of the exclusionary rule." *Id.* at 918. The Court identified only four circumstances in which exclusion of evidence seized pursuant to a warrant is appropriate. Those are when: (1) the issuing magistrate was misled by the inclusion of knowing or recklessly false information; (2) the issuing magistrate wholly abandoned the detached and neutral judicial role; (3) the warrant is facially deficient as to its description of the place to be searched or the things to be seized; or (4) the affidavit upon which the warrant is based is so lacking in indicia of probable cause that no reasonable officer could rely on it in good faith." *Id.* at 923-24. None apply here.

Here, the warrant contained no knowingly or recklessly false information (or omission) that was material to the issue of probable cause. Nor does the defendant allege that the issuing Circuit Court judge abandoned his judicial role. The warrant clearly and particularly described the information to be searched and what law enforcement would be seizing. And the affidavit made a comprehensive showing of probable cause to issue the warrant. Absent any of these errors, once the judge signed the warrant, the officers' reliance on that authority was objectively reasonable. *See Massachusetts v. Sheppard*, 468 U.S. 981, 989-90 (1984) ("[W]e refuse to rule that an officer is required to disbelieve a judge who has just advised him, by word and by action, that the warrant he possesses authorizes him to conduct the search he has requested."). Ultimately, the FCPD detectives and officers acted reasonably in relying on the Circuit Court's authorization of the warrant, and so the evidence seized pursuant to it should not be suppressed.

III.   **WERE THE COURT TO FIND THAT EVIDENCE PROVIDED BY META PLATFORMS PURSUANT TO THE FACEBOOK SEARCH WARRANT WAS ILLEGALLY OBTAINED, EVIDENCE OBTAINED AS A RESULT OF THE FIRST AND SECOND APARTMENT SEARCH WARRANTS IS SUFFICIENTLY ATTENUATED FROM ANY VIOLATION TO RENDER SUPPRESSION UNJUSTIFIED.**

### A. Application of the Exclusionary Rule is Neither Automatic Nor Unlimited

The Fourth Amendment's exclusionary rule does not provide "a personal constitutional right, nor is it designed to redress the injury occasioned by an unconstitutional search." *Davis v. United States*, 564 U.S. 229, 236 (2011) (quoting *Stone v. Powell*, 428 U.S. 465, 468 (1976)) (internal quotation marks omitted). The exclusionary "rule's sole purpose . . . is to deter future Fourth Amendment violations." *Davis*, 564 U.S. at 236 (collecting cases). The real deterrent value "is a 'necessary condition for exclusion,' but it is not a 'sufficient' one." *Id.* at 237 (quoting *Hudson v. Michigan*, 547 U.S. 586, 596 (2006)). There are substantial costs associated with its application. *Id.* ("Exclusion exacts a heavy toll on both the judicial system and society at large . . . It almost always requires courts to ignore reliable, trustworthy evidence bearing on guilt or innocence."). The practical effect in nearly every case "is to suppress the truth and set the criminal loose in the community without punishment." *Id.* (citing *Herring v. United States*, 555 U.S. 135, 141 (2009)). Accordingly, it is to be employed "only as a 'last resort'" – that is, when "the deterrence benefits of suppression . . . outweigh its heavy costs." *Id.* (quoting *Hudson*, 547 U.S. at 591); *United States v. Stephens*, 764 F.3d 327, 335 (4th Cir. 2014) ("[E]xclusion of evidence has 'always been [the] last resort, not [the] first impulse.'" (quoting *Hudson*, 547 U.S. at 591) (alterations in original)). "Police practices trigger the harsh sanction of exclusion only when they are deliberate enough to yield meaningful deterrence, and culpable enough to be worth the price paid by the justice system." *Id.* (quoting *Davis*, 564 U.S. at 240).

Perkins argues that the searches of his residence were "tainted by the original search from Facebook" and therefore "those searches ought to be suppressed." Def's Mem. at 21.  In a nutshell, he seems to argue that if the Court were to find a *Franks* violation with respect to the Facebook Search Warrant, then any derivative evidence – no matter how far attenuated – should be suppressed as fruit of the poisonous tree.  However, "[a] criminal prosecution is more than a game in which the Government may be checkmated and the game lost merely because its officers have not played according to rule."  *United States v. Ceccolini*, 435 U.S. 268 (1978) (quoting *McGuire v. United States*, 273 U.S. 95, 99 (1927).  "The exclusionary rule does not apply to all evidence that is the product of an unconstitutional search or seizure no matter how indirectly related."  *United States v. David*, 943 F. Supp. 1403, 1414 (1996).  The United States contends that even if, *arguendo*, the Facebook Search Warrant were found to be invalid, the attenuation doctrine – an exception to the exclusionary rule – would nevertheless render evidence obtained from Perkins' residence admissible in the government's case-in-chief.

While suppression is the appropriate remedy for a *Franks* violation, the Supreme Court has "never held that evidence is 'fruit of the poisonous tree' simply because 'it would not have come to light but for the illegal actions of the police.'"  *Hudson v. Michigan*, 547 U.S. 586, 592 (2006) (quoting *Segura v. United States*, 468 U.S. 796, 815 (1984)).  "To constitute fruit of the poisonous tree, more than a 'but for' relationship must exist between the challenged evidence and the unconstitutional conduct."  *David*, 943 F. Supp. 1403, 1414 (1996).  The exclusionary rule only forbids the introduction of evidence obtained pursuant to an unlawful search or derivative of the product of that unlawful search "up to the point at which the connection with the unlawful search becomes 'so attenuated as to dissipate the taint.'"  *Murray v. United States*, 487 U.S. 533, 536-37 (1988) (quoting, in part, *Nardone v. United States*, 308 U.S. 338, 341

(1939)).  As the Supreme Court explained in *Ceccolini*, "[e]ven in situations where the exclusionary rule is plainly applicable, we have declined to adopt a "per se" or "but for" rule that would make inadmissible any evidence . . . which somehow came to light through a chain of causation that began with a [Fourth Amendment violation]."  435 U.S. at 276.

A "direct, unbroken chain of causation is necessary, but not sufficient to render derivative evidence inadmissible."  *United States v. Najjar*, 300 F.3d 466, 477 (4th Cir. 2002).  The "attenuation doctrine" is an analysis guided by three factors promulgated by the Supreme Court in *Brown v. Illinois*, 422 U.S. 590 (1975).  In determining whether evidence discovered subsequent to illegal police conduct is nonetheless admissible pursuant to this doctrine (i.e., "whether the fruit is no longer poisonous"), the Court is to consider: (1) "the amount of time between the illegal action and the acquisition of the evidence;" (2) "the presence of intervening circumstances;" and (3) "the purpose and flagrancy of the official misconduct."  *United States v. Najjar*, 300 F.3d at 477 (internal citations omitted).  This is a case-by-case, fact-specific analysis."  *Id.*

### B. Evidence Recovered from Perkins' Apartment Was Attenuated from the Facebook Search Warrant

If the Court were to find Detective Andrea misled the Fairfax County Circuit Court by omission intentionally or with reckless disregard for the truth, then the third *Brown* factor, the purpose and flagrancy of the official misconduct, would cut against the prosecution.  However, the analysis would not end there.  With respect to the passage of time, more than a week passed between Detective Andrea applying for the Facebook Search Warrant and the execution of the First and Second Apartment Search Warrants.

Moreover, there were intervening circumstances that dissipated any taint from the initial warrant.  Had the data provided by Meta Platforms pinpointed the defendant's location at a

particular dwelling, and had the FCPD simply monitored that data and relied solely on that data

in applying for residential search warrants, Perkins would have a stronger argument for

suppression of evidence from his residence if the Court were to find Detective Andrea violated

*Franks* when he obtained the Facebook Search Warrant.  However, that is not what happened in

this case.  To the contrary, the Meta Platforms data merely provided the police with a lead,

namely: an apartment building.  Law enforcement still had to ascertain in which apartment the

defendant was residing, and so they took multiple investigative steps to do so.  First, Detective

Andrea and Special Agent Shively travelled to the apartment complex, conducted physical

surveillance, and saw Perkins leave that building.  They then proceeded to follow him to another

county, where Special Agent Shively eventually followed Perkins on foot and photographed him

wearing a hat consistent with the one worn by O1 during the February 5 robberies and the

individual believed to be Perkins on his Instagram account.  Then, the police established

electronic surveillance (meaning that they installed hidden cameras) that captured Perkins

coming and going from a particular apartment over the course of four days.  Any hypothetical

taint from the Facebook Search Warrant would have certainly been attenuated by the intervening

steps that law enforcement took before obtaining an arrest warrant for Perkins and a search

warrant for his residence.

      Even if the Court were to find that the information provided by Meta Platforms pursuant

to the Facebook Search Warrant was illegally obtained, references to that information in the

affidavit in support of the First Apartment Search Warrant do not automatically invalidate the

residential search.  The Fourth Circuit has noted that "the case law establishes that, even if an

affidavit supporting a search warrant is based on part on some illegal evidence, such inclusion of

illegal evidence does not taint the entire warrant if it is otherwise properly supported by probable

cause." *Simmons v. Poe*, 47 F.3d 1370, 1378 (1995) (citing *United States v. Smith*, 730 F.2d 1052, 1056 (6th Cir. 1984); *United States v. Williams*, 633 F.2d 742, 745 (8th Cir. 1980); *James v. United States*, 418 F.2d 1150, 1152 (D.C. Cir. 1969). "Thus, unless the tainted information is so important that 'probable cause did not exist without it,' the warrant will be deemed valid." *Simmons*, 47 F.3d at 1378 (citing *Smith*, 730 F.2d at 1056).  In other words, the Court can excise the illegally obtained information from the search warrant affidavit and evaluate the presence or absence of probable cause without it.  Were the Court to remove the references to the Facebook location evidence from the First Apartment Search Warrant, probable cause would still exist in light of the information contained about law enforcement physically and remotely observing Perkins coming and going from that apartment for several days.

## CONCLUSION

Wherefore, for the foregoing reasons, the defendant's Motion to Suppress should be denied.  The search warrants issued by the Fairfax County Circuit Courts were valid, supported by probable cause, and devoid of no facts that would have defeated that probable cause.

Respectfully submitted,

Jessica D. Aber
United States Attorney

By:  _____/s/_____
John C. Blanchard
Nicholas J. Patterson
Assistant United States Attorneys
Office of the United States Attorney
2100 Jamieson Avenue
Alexandria, Virginia 22314
Phone: (703) 299-3999
Fax:   (703) 299-3980
John.Blanchard@usdoj.gov

30

**<u>CERTIFICATE OF SERVICE</u>**

I certify that on August 22, 2022, I filed the foregoing document with the Clerk of Court using the CM/ECF system, which will cause a true and accurate copy of this document to be transmitted to counsel of record.

By: _____*/s/*_____
John C. Blanchard
Assistant United States Attorney
Office of the United States Attorney
2100 Jamieson Avenue
Alexandria, Virginia 22314
Phone: (703) 299-3999
Fax:   (703) 299-3980
John.Blanchard@usdoj.gov